CASE NO. 24-3970

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

REARDEN, LLC and REARDEN MOVA, LLC,

*Plaintiffs-Appellants*,

v.

WALT DISNEY PICTURES,

*Defendant-Appellee.*

On Appeal from the United States District Court
Northern District of California
The Honorable Jon S. Tigar
4:17-cv-04006-JST

**APPELLEE'S ANSWERING BRIEF**

**MUNGER, TOLLES & OLSON LLP**
Kelly M. Klaus
Kelly.Klaus@mto.com
Blanca F. Young
Blanca.Young@mto.com
Stephanie G. Herrera
Stephanie.Herrera@mto.com
Shannon Aminirad
Shannon.Aminirad@mto.com
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
(415) 512-4000

*Attorneys for Defendant-Appellee Walt Disney Pictures*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form34instructions.pdf

**9th Cir. Case Number(s)**   24-3970

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

Walt Disney Pictures

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
   
   ⦿ Yes      ○ No

   If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   The Walt Disney Company; TWDC Enterprises 18 Corp.; Disney Enterprises, Inc.

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
   
   ⦿ Yes      ○ No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                    *1*                    *New 12/01/24*

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

> The Walt Disney Company (NYSE: DIS)

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

> N/A

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

> N/A

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?
   ○ Yes   ◉ No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

◉ this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** | s/ Kelly M. Klaus | **Date** | 2/3/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                          2                          *New 12/01/24*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES ..........................................................4

STATEMENT OF JURISDICTION .....................................................5

STATEMENT OF THE CASE ..............................................................5

I.    FACTUAL BACKGROUND .........................................................5

    A.    WDP Selects A Well-Known Vendor To Animate The Beast ............5

    B.    MOVA's Limited Contribution To Animating The Beast ..................5

        1.    *DD3 Uses MOVA To Obtain Data That Helps Animate The Beast's Facial Movements In Some Shots* ........................6

        2.    *DD3's Work To Create The Rest Of The Beast* ........................8

    C.    All Of The Other Work That Went Into *BATB* ................................11

    D.    The Film's Success ................................................................12

    E.    MOVA's Tangled Ownership History ................................................13

        1.    *Rearden Loses Ownership To OL2, Which Transfers Ownership To MO2 For $1* ........................................................13

        2.    *WDP Had No Practical Ability To Recognize, Or To Resolve, A MOVA Ownership Dispute During Filming* ..........15

    F.    The SHST Litigation And Rearden's Later Lawsuits Against WDP And Other Studios ................................................................16

II.    THE DISTRICT COURT'S RULINGS AT ISSUE ON APPEAL .............17

    A.    The District Court's Motion *In Limine* Rulings .................................17

        1.    *Exclusion of Rearden's Expert Apportionment Opinions* ........17

        2.    *Exclusion of DD3 Indemnification Agreement* ........................18

    B.    The District Court's Grant Of Motion To Strike The Jury Demand ................................................................................19

    C.    The District Court's Grant Of Judgment As A Matter Of Law ..........20

SUMMARY OF THE ARGUMENT ...................................................21

ARGUMENT.................................................................................22

I.      THE DISTRICT COURT PROPERLY GRANTED JUDGMENT AS
        A MATTER OF LAW ON REARDEN'S VICARIOUS
        COPYRIGHT INFRINGEMENT CLAIM.................................22

        A.      The Practical Ability To Control A Third Party's Infringement
                Requires A Practical Way To Recognize Infringement ....................22

        B.      Rearden Failed To Introduce Sufficient Evidence That WDP
                Had The Practical Ability To Control DD3's Infringement..............27

                1.      *Legal Rights Regarding DD3's Services Do Not
                        Establish A Practical Ability To Control The Infringing
                        Conduct* .................................................................27

                2.      *The Mere Presence Of Mr. Condon And Mr. Gaub At
                        Capture Sessions Does Not Establish A Practical Ability
                        To Control The Infringing Conduct*.........................................28

                3.      *Rearden Did Not Present Sufficient Evidence At Trial
                        That WDP Had A Practical Ability To Recognize The
                        Infringing Conduct Was Occurring*.........................................30

II.     IT WAS NOT ERROR TO PROCEED WITH AN ADVISORY
        JURY ON REARDEN'S PROFITS CLAIM .............................35

        A.      Rearden Had No Right To A Trial By Jury On Its Profits Claim.......35

                1.      *Section 504(b) Of The Copyright Act Does Not Authorize
                        A Jury Trial On Defendant's Profits* .........................................36

                2.      *There Is No Seventh Amendment Right To A Jury Trial
                        On Profits* .................................................................42

        B.      The District Court Properly Struck The Jury Demand And
                Exercised Its Discretion To Impanel An Advisory Jury ...................45

                1.      *The District Court's Decision Complied With Rules 38
                        and 39*.................................................................46

                2.      *The Court Did Not Err In Impaneling An Advisory Jury
                        Before Submitting The Case To The Jury*...............................49

                3.      *Even If The District Court Erred In Impaneling An
                        Advisory Jury, This Court Should Affirm Or,
                        Alternatively, Reinstate The Jury's Verdict*...............................54

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        EXCLUDING THE APPORTIONMENT OPINIONS OF
        REARDEN'S DAMAGES EXPERT ........................................................55

IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        EXCLUDING THE DD3 INDEMNIFICATION AGREEMENT ...............59

CONCLUSION ................................................................................................62

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001)................................................................*passim*

*Adams v. Cyprus Amax Mins. Co.*,
149 F.3d 1156 (10th Cir. 1998).........................................................36

*Adobe Sys. Inc. v. Canus Prods., Inc.*,
173 F. Supp. 2d 1044 (C.D. Cal. 2001)................................25, 26, 30

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
166 F.3d 772 (5th Cir. 1999)...........................................................51

*Armstrong v. Hawaiian Airlines, Inc.*,
No. 18-00326 ACK-WRP, 2019 WL 13162437 (D. Haw. Oct. 29,
2019) ................................................................................................59

*Artists Music, Inc. v. Reed Publ'g (USA), Inc.*,
No. 93 CIV 3428 (JFK), 1994 WL 191643 (S.D.N.Y. May 17,
1994) ................................................................................................26

*Assessment Techs. Inst., LLC v. Parkes*,
No. 19-2514-JAR, 2022 WL 588889 (D. Kan. Feb. 25, 2022) .................35, 37

*Bereda v. Pickering Creek Indus. Park, Inc.*,
865 F.2d 49 (3d Cir. 1989).........................................................50, 52

*Bertuccelli v. Universal Studios LLC*,
No. CV 19-1304, 2021 WL 2227337 (E.D. La. June 2, 2021).........................37

*Bonomi v. Gaddini*,
216 F. App'x 717 (9th Cir. 2007)....................................................54

*Capture Eleven Grp. v. Otter Prods., LLC*,
No. 1:20-CV-02551-CNS-KLM, 2023 WL 5573966 (D. Colo.
May 31, 2023)..................................................................................38

*Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*,
494 U.S. 558 (1990).........................................................................39

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
    526 U.S. 687 (1999)...............................................................38

*Estate of Clayton Roy Zahn v. City of Kent*,
    No. C14-1065RSM, 2016 WL 541397 (W.D. Wash. Feb. 11, 2016)...............59

*Davis & Cox v. Summa Corp.*,
    751 F.2d 1507 (9th Cir. 1985)...............................................44

*Dorn v. Burlington N. Santa Fe R.R. Co.*,
    397 F.3d 1183 (9th Cir. 2005)...............................................57

*Dupree v. Younger*,
    598 U.S. 729 (2023)...........................................................28

*Ed Peters Jewelry Co. v. C & J Jewelry Co.*,
    215 F.3d 182 (1st Cir. 2000) ................................................52

*Fair Isaac Corp. v. Fed. Ins. Co.*,
    468 F. Supp. 3d 1110 (D. Minn. 2020)...............................35, 37, 43

*Feltner v. Columbia Pictures Television, Inc.*,
    523 U.S. 340 (1998)...........................................................39

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
    778 F.3d 1059 (9th Cir. 2015)...............................................42

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996)...........................................23, 24, 26

*Fuller v. City of Oakland*,
    47 F.3d 1522 (9th Cir. 1995), *as amended* (Apr. 24, 1995) .........44, 48, 54

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...........................................................55

*Hildebrand v. Bd. of Trs. of Mich. St. Univ.*,
    607 F.2d 705 (6th Cir. 1979)................................................51

*Huffman v. Activision Publ'g, Inc.*,
    No. 2:19-CV-00050-RWS-RSP, 2021 WL 2339193 (E.D. Tex.
    June 8, 2021) .................................................................38

*Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co.*,
    195 F.3d 368 (8th Cir. 1999)......................................................................52, 54

*Ioane v. Spjute*,
    No. 1:07-CV-0620 AWI EPG, 2016 WL 4524752 (E.D. Cal. Aug.
    29, 2016).................................................................................................59, 60

*JL Beverage Co. v. Jim Beam Brands Co.*,
    815 F. App'x 110 (9th Cir. 2020).............................................................40, 43

*Kingsbury v. U.S. Greenfiber, LLC*,
    No. CV 08-151 DSF, 2013 WL 12121540 (C.D. Cal. Nov. 4, 2013)...............45

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)........................................................................................55

*Larez v. Holcomb*,
    16 F.3d 1513 (9th Cir. 1994)..........................................................................60

*McEuin v. Crown Equip. Corp.*,
    328 F.3d 1028 (9th Cir. 2003), *as amended on denial of reh'g and
    reh'g en banc* (June 17, 2003).......................................................................59

*Merex A.G. v. Fairchild Weston Sys., Inc.*,
    29 F.3d 821 (2d Cir. 1994)................................................................48, 52, 53

*Navarro v. Procter & Gamble Co.*,
    529 F. Supp. 3d 742 (S.D. Ohio 2021).........................................35, 37, 40, 42

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007)........................................................22, 24, 27

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014).......................................................................35, 41, 44

*Pradier v. Elespuru*,
    641 F.2d 808 (9th Cir. 1981)..........................................................49, 50, 52

*Rose Court, LLC v. Select Portfolio Servicing, Inc.*,
    119 F.4th 679 (9th Cir. 2024)..........................................................................46

*Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*,
    39 F.4th 1113 (9th Cir. 2022)....................................................................47, 48

*S.E.C. v. Quan,*
817 F.3d 583 (8th Cir. 2016)...........................................................41

*S.E.C. v Rind,*
991 F.2d 1486 (9th Cir. 1993)........................................................42

*Shapiro, Bernstein & Co. v. H. L. Green Co.,*
316 F.2d 304 (2d Cir. 1963)....................................................23, 25

*Sheldon v. Metro-Goldwyn Pictures Corp.,*
309 U.S. 390 (1940)........................................................................40

*SHST v. Rearden LLC,*
No. 15-cv-00797-JST, 2017 WL 3446585 (N.D. Cal. Aug. 11,
2017) ..............................................................................................17

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,*
562 F.2d 1157 (9th Cir. 1977)........................................................43

*Siegel v. Warner Bros. Ent. Inc.,*
581 F. Supp. 2d 1067 (C.D. Cal. 2008) .........................................37

*Silvas v. E*Trade Mortg. Corp.,*
514 F.3d 1001 (9th Cir. 2008)........................................................49

*Skidmore v. Led Zeppelin,*
952 F.3d 1051 (9th Cir. 2020)........................................................43

*Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.,*
895 F.3d 1304 (Fed. Cir. 2018) ..................................35, 39, 42, 43

*Thomas v. Broward Cnty. Sheriff's Office,*
71 F.4th 1305 (11th Cir. 2023).........................................50, 51, 52

*Thompson v. Parkes,*
963 F.2d 885 (6th Cir. 1992)..................................50, 51, 52, 54

*Tracinda Corp. v. DaimlerChrysler AG,*
502 F.3d 212 (3d Cir. 2007)...........................................................45

*Traxler v. Multnomah Cnty.,*
596 F.3d 1007 (9th Cir. 2010).................................................45, 48

*Trevino v. Gates*,
    99 F.3d 911 (9th Cir. 1996)...........................................................................59

*Tull v. United States*,
    481 U.S. 412 (1987).............................................................................36, 42

*United States v. Decoud*,
    456 F.3d 996 (9th Cir. 2006)....................................................................55, 56

*United States v. Gardner*,
    417 F. Supp. 2d 703 (D. Md. 2006)..............................................................41

*United States v. Grover*,
    485 F.2d 1039 (D.C. Cir. 1973) ..................................................................41

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*,
    No. SACV 12-00329 AG (JPRx), 2014 WL 12587050 (C.D. Cal.
    Dec. 16, 2014) .............................................................................................48

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019)............................................................*passim*

**FEDERAL STATUTES**

17 U.S.C. § 504 .................................................................................................36

17 U.S.C. § 504(b) ....................................................................................*passim*

17 U.S.C. § 504(c) .............................................................................................39

**FEDERAL RULES**

Fed. R. Evid. 403 ..........................................................................5, 18, 59, 62

Fed. R. Civ. P. 38.......................................................................................46, 47

Fed. R. Civ. P. 39....................................................................45, 47, 48, 51

Fed. R. Civ. P. 50.............................................................................................22

**CONSTITUTIONAL PROVISIONS**

Seventh Amendment.................................................................................*passim*

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 94-1476 (1976) .......................................................................37, 38

**OTHER AUTHORITIES**

5 Nimmer on Copyright § 14.03 ...........................................................44

Pamela Samuelson et al., *Recalibrating the Disgorgement Remedy in Intellectual Property Cases*, 100 B.U. L. Rev. 1999 (2020) ............................43

**INTRODUCTION**

Defendant-Appellee Walt Disney Pictures ("WDP") has produced some of the world's most beloved movies, including the 1991 animated movie *Beauty and the Beast*. In March 2017, WDP released a live-action version of this classic tale ("*BATB*") starring Emma Watson and Dan Stevens in the titular roles.

Reimagining *Beauty and the Beast* as a live-action movie was a monumental creative undertaking. Thousands of people and more than 200 vendors worked on developing and producing the film for over two years. Production involved re-recording the iconic songs, choreographing elaborate dances, literally constructing an entire village, and, of course, bringing the cherished animated characters to life. The efforts of the studio and many talented artists made the film a huge success.

In July 2017, Plaintiffs-Appellants Rearden, LLC and Rearden MOVA, LLC ("Rearden") brought this lawsuit, claiming that one of the hundreds of third-party vendors who worked on *BATB* used one software program without authorization. That vendor, Digital Domain 3.0 ("DD3"), had worked with all the major studios on numerous blockbuster films for over a decade. The software at issue, MOVA Contour ("MOVA"), was a program DD3 used to scan Mr. Stevens's facial movements and to generate data for an early stage of animating the computer-generated ("CG") Beast's face in some scenes. Over 160,000 hours of *additional* work, and dozens of other technologies were required to create the rest of the CG

Beast and to integrate him into the movie's magical world. DD3 represented and warranted it had all necessary rights to use all technology on the film. WDP had no reason to believe otherwise when it engaged DD3 for *BATB*.

As WDP later learned, a complex dispute had unfolded about who owned MOVA. It took years of litigation and a bench trial to resolve that question. In August 2017, months after *BATB* was released, a court determined Rearden had reacquired ownership of MOVA via a clandestine transaction years earlier—before DD3 used MOVA on *BATB*, and entirely unbeknownst to WDP.

Rearden used that decision to pursue a novel theory of vicarious copyright liability against WDP, seeking a windfall portion of the movie's profits. Rearden argued WDP should be responsible for DD3's unauthorized use of the MOVA software, even though WDP had no practical ability to detect that DD3's use was unauthorized at the time. And Rearden claimed the MOVA software was responsible for *$38 million* of the movie's profits—more than *40 times* the amount Mr. Stevens was paid for portraying the Beast, nearly *100 times* the largest amount Rearden ever charged for MOVA services, and *$38 million* more than Rearden ever profited from MOVA services. The advisory jury, and then the district court, rejected this demand, instead crediting WDP's abundant evidence that the movie's profits were attributable almost entirely to factors other than MOVA.

The evidence at trial also showed there was no practical way for WDP to recognize DD3's unauthorized use of MOVA in these circumstances. It is not practical for a studio to investigate whether every one of the numerous vendors who work on a major motion picture has rights to use every piece of software they touch. The evidence also showed that, even if WDP had had reason during filming to investigate DD3's right to use MOVA (it did not), WDP would have learned at most that Rearden *claimed* to own MOVA but had not a single piece showing such ownership. For these reasons, the district court ultimately concluded, under longstanding Ninth Circuit precedent, there was not sufficient evidence to hold WDP vicariously liable for copyright infringement.

The district court likewise correctly granted WDP's motion to strike Rearden's jury demand for a portion of WDP's profits from the movie. Even if that was error (it was not), there is no conceivable harm: Rearden prepared and presented its case-in-chief as a jury case; the court granted Rearden's request for an advisory jury; and the court ultimately agreed with the advisory jury's profits number, which reflected the market value of MOVA services based on objective evidence. Rearden says the apportionment opinions of its damages expert Philip Fier would have supported its $38 million demand, but it was not error to exclude apportionments that had no grounding in any methodology or evidence.

In short, even if Rearden were entitled to judgment on its vicarious liability claim, there is no possible argument for a retrial. Rearden should not get a second chance to shoot the moon on a fanciful damages demand a jury has rejected.

## STATEMENT OF THE ISSUES

1.  Did the district court properly grant judgment as a matter of law on Rearden's vicarious copyright infringement claim, given the lack of evidence that WDP had the *practical ability to control DD3's infringement*, as opposed to a legal right to control DD3?

2.  Did the district court err by granting WDP's pretrial motion to strike Rearden's jury demand with respect to indirect profits under 17 U.S.C. § 504(b), which does not authorize a jury trial for this equitable remedy, before submitting the case to the jury and without objection from Rearden; and if so, was any error harmless because Rearden fully tried its case to a jury that rendered an advisory verdict (at Rearden's request), which the district court confirmed?

3.  Did the district court abuse its discretion in excluding the apportionment opinions of Rearden's damages expert Philip Fier, who assigned percentages reflecting MOVA's alleged contribution to *BATB*'s profits based on his subjective and unexplained views after watching the movie once through?

4.      Did the district court abuse its discretion in excluding evidence of DD3's agreement to indemnify WDP, where the risk of confusion and unfair prejudice outweighed any probative value, Fed. R. Evid. 403?

## STATEMENT OF JURISDICTION

WDP agrees with Rearden's jurisdictional statement.

## STATEMENT OF THE CASE

## I.      FACTUAL BACKGROUND

### A.      WDP Selects A Well-Known Vendor To Animate The Beast

WDP produced the 2017 *BATB*, a live-action reimagining of the beloved 1991 animated film.  2-SER-224:17-21.  Early in the film's production, WDP decided to use visual effects to create the Beast character.  2-SER-230:24-231:8. In March 2015, WDP engaged DD3 for this work.  4-ER-745-797.

DD3 is a well-known visual-effects vendor.  2-SER-243:8-15.  Co-founded by James Cameron, DD3 has worked with all the major studios, including on celebrated films such as *Titanic* and *Apollo 13*.  *Id.*  When it hired DD3 for *BATB*, WDP had worked with DD3 for more than a decade, including on *Maleficent* (2014), *Avengers* (2012), and *Tron: Legacy* (2010).  2-SER-243:8-244:1; 2-SER-249:14-19.

### B.      MOVA's Limited Contribution To Animating The Beast

MOVA was one of dozens of technologies DD3 used to create the CG Beast. 2-SER-250:6-251:2.  This was not the first time DD3 had used MOVA on a WDP

film.  DD3 had also used MOVA on *Avengers* and *Tron: Legacy* (when it was

indisputably owned by Rearden).  3-ER-304:2-7; 3-ER-306:3-10; 2-SER-249:14-

19.

MOVA is a technology that captures an actor's facial movements.[1]  The

MOVA system is comprised of physical components, including a large metal rig of

cameras and strobing lights and special makeup applied to the actor's face.  3-ER-

279:1-281:1.  The MOVA system also includes a software program, which directs

the operation of the cameras and lights and processes the data the cameras capture.

3-ER-279:1-9.  The MOVA software program is the copyrighted work at issue.  2-

ER-89.

**1.**    ***DD3 Uses MOVA To Obtain Data That Helps Animate The Beast's Facial Movements In Some Shots***

DD3 used MOVA to capture the movements of Dan Stevens' face while

performing scenes as the Beast, and then used the resulting data at an early stage of

animating the Beast's facial movements in some shots.  2-SER-307:2-11.

After filming scenes on set, Mr. Stevens participated in facial-motion

capture sessions in the rig.  2-SER-363-364.  DD3 employed a technician, Greg

_____

[1] When *BATB* was filmed, there were multiple high-quality alternatives to MOVA. 2-SER-231:17-232:10; 2-SER-304:14-22.  WDP's original plan for *BATB* was to use a facial-motion-capture system called Medusa, which is owned by WDP's affiliate.  2-SER-253:5-13. DD3 had recently used Medusa on *Maleficent*.  2-SER-244:2-13.

LaSalle, to operate the rig and associated software. 2-SER-359. Mr. LaSalle had also operated the MOVA system when DD3 worked on *Avengers* and *Tron: Legacy*. 2-SER-394-395. Most of the sessions occurred during shooting in 2015. 1-SER-193:10-25. The last session was a June 14, 2016 reshoot. 1-SER-193:21-25; 2-SER-259:24-260:3.

The MOVA system outputs data in the form of a "tracked mesh." 2-SER-305:12-25. When rendered on a computer, the tracked mesh appears like the gray mask in Figure 1. 1-SER-184:3-6. It has no eyes, mouth, teeth, or tongue, because those areas are not sprayed with the special makeup and are therefore not captured by the technology. 1-SER-180:3-181:9; 2-SER-307:18-25.



**Figure 1:** 3-SER-519; 2-SER-306:2-13.

## 2. *DD3's Work To Create The Rest Of The Beast*

The tracked mesh was used, if at all, to help animate the Beast's facial movements at an early stage of an enormously complex process to create the entire CG Beast. As depicted in Figure 2, MOVA data was used to help animate the Beast's facial movements at an early step in the 311 versions it took to create a single shot in the famous Belle-Beast waltz scene.



**Figure 2:** Trial demonstrative, based on 3-SER-520-522.

Hundreds of DD3 visual-effects artists spent over 169,000 hours—the equivalent of more than 19 years—creating the CG Beast. 2-SER-250:2-5; 2-SER-306:20-25; 2-SER-317:2-318:2. MOVA-related work accounted for less than 1% of this time. 2-SER-317:23-318:2. The rest of this time involved large teams of visual-effects artists creating the rest of the CG Beast and seamlessly integrating him with other CG characters and live-action performances. The numerous steps

in this process—called the animation pipeline—included animation, shot modeling, character effects, rotomotion, paint, lighting, and compositing. 2-SER-309:23-314:11. Figures 3 to 5 depict some of these steps. All of this work involved at least 30 different software programs. 2-SER-250:9-17.



**Figure 3:** Shot Modeling. 3-SER-526-527.



**Figure 4:** Character Effects. 3-SER-528-529.



**Figure 5:** Rotomotion and Paint.  3-SER-522-525; 3-SER-530-531.

On the Beast's face alone, animators performed significant work to bring the character to life, such as creating realistic eyes, animating the mouth and lips, and simulating each hair that makes up the Beast's fur—none of which involve MOVA.  1-SER-185:10-187:5; 2-SER-233:22-235:6; 2-SER-309:25-311:2.  These combined artistic efforts resulted in an on-screen face (Figure 6) that bears no resemblance to the tracked mesh (Figure 1).



**Figure 1:** 3-SER-519.



**Figure 6:** 3-SER-405.

-10-

The trial evidence also made clear that MOVA was not integral to creating the Beast. More than half the shots that included the Beast—and 91% of all shots in the entire movie—did not involve any use of the tracked mesh. 2-SER-315:24-316:24. For Beast shots not using MOVA, artists animated the Beast's facial movements by hand, with no noticeable difference between the two methods. 2-SER-315:24-316:10; 2-SER-320:19-23. Even when animators used the tracked mesh, they still had to make adjustments to account for the different shapes and proportions of Mr. Stevens's and the Beast's faces. 2-SER-308:13-21.

## C. All Of The Other Work That Went Into *BATB*

Beyond DD3's work to create the CG Beast, it took the creative efforts of thousands of people and hundreds of vendors to produce *BATB*.

*BATB* included significant other visual effects created by DD3 and three other vendors. 2-SER-245:3-7. DD3 also created the CG wolves and the digital environment. 2-SER-252:20-253:4. Another vendor created the beloved household staff, including Lumière, Cogsworth, and Mrs. Potts. 2-SER-236:7-237:11; 2-SER-238:17-20. Even Belle's iconic yellow dress was digitally enhanced. 2-SER-240:17-241:2. Hundreds of artists at each vendor used numerous software programs and technologies to create these effects. 2-SER-250:9-17; 2-SER-258:14-25. For WDP, what mattered was the end result, not the particular technologies used to create a particular shot. 2-SER-242:15-20.

Much else went into *BATB* beyond visual effects. Over 200 vendors worked on the movie. 2-SER-246:16-18. Among countless other elements, choreographers crafted elaborate dances that live dancers performed, and craftsmen constructed an entire village, depicted in Figure 7, among many other elaborate sets. 2-SER-229:14-22; 2-SER-235:16-18. Principal photography, from May to August 2015, involved hundreds of people. 2-SER-225:21-226:23. Post-production, from August 2015 to early 2017, involved over a thousand people. 2-SER-227:1-6; 2-SER-227:12-14.



**Figure 7:** Village set. 3-SER-407.

### D. The Film's Success

*BATB* was released on March 17, 2017. 2-ER-106. A nine-figure marketing campaign supported the film's global release. 2-SER-266:12-267:1; 2-SER-281:25-283:24. WDP's marketing plans do not mention MOVA, instead focusing

on nostalgia and affection for the 1991 film and Ms. Watson's casting as Belle. 2-SER-265:7-17; 2-SER-267:8-273:3; 3-SER-408-513. The film earned $214.6 million in profits. 2-SER-324:8-325:2.

### E. MOVA's Tangled Ownership History

Rearden's opening brief entirely omits the contested ownership history of the MOVA technology—the core liability dispute in this case.

#### 1. *Rearden Loses Ownership To OL2, Which Transfers Ownership To MO2 For $1*

After developing MOVA, in 2007, Rearden assigned the associated assets to an affiliate, OnLive, Inc. ("OnLive"). 3-ER:310:25-313:16. On August 17, 2012, as part of a bankruptcy-related process, ownership transferred from OnLive to OL2, Inc. ("OL2"), an entity controlled by Gary Lauder, who was not associated with Rearden. 2-SER-223:11-16; *see also* 1-SER-152:18-153:4; 1-SER-158:23-159:11. It was undisputed at trial that Rearden lost ownership of MOVA in 2012. 2-ER-106.

Mr. Lauder attempted to find a buyer for the MOVA assets. 2-SER-387-389. Mr. Lauder offered to sell MOVA to The Walt Disney Company, which passed. 2-SER-388-389. It was uncontroverted that, as of 2012, WDP's affiliate The Walt Disney Company was aware Mr. Lauder's company, not Rearden, owned MOVA.

At the urging of Rearden's founder and CEO, Steve Perlman, Mr. Lauder transferred the MOVA assets for $1 to Mr. LaSalle, who had long operated the MOVA system on studio projects.  2-SER-387-389.  Mr. Perlman was clear that Mr. LaSalle was "to get all the assets for free.  End of story."  3-SER-514; 1-SER-162:5-163:18.

To effectuate this, OL2 transferred ownership of the copyright to MO2, LLC ("MO2") in February 2013.  2-SER-223:17-18; 3-SER-532; *see also* 1-SER-154:20-155:9.  MO2's articles of organization identify Mr. LaSalle as the company's organizer and do not mention Rearden or Mr. Perlman.  3-SER-563; 2-SER-164:16-20; 2-SER-284:13-289:24.  Mr. LaSalle paid for MOVA with a personal check.  2-SER-289:17-22.

Mr. LaSalle thereafter attempted to sell or license the MOVA assets.  In February 2013, he contacted WDP affiliate Walt Disney Animation Studios about acquiring MOVA, but it passed.  2-SER-397-398.  Mr. LaSalle eventually arranged for a sale of the MOVA assets to a DD3 affiliate.  2-SER-294:23-295:14.  Mr. LaSalle then joined DD3 and continued operating the MOVA technology.  2-SER-303:11-18.

Rearden's opening brief omits all of this, stating only that "OnLive was succeeded by OL2, Inc., which assigned MOVA back to Rearden."  Br. 5.  At trial, Rearden argued that OL2 transferred MOVA to MO2 and that MO2 had been

formed as a Rearden subsidiary; this was supported only by testimony from Mr. Perlman and his longtime employee Cindy Ievers. No contemporaneous documents or emails link Rearden to MO2. 1-SER-165:10-171:2. The only documents associating Rearden with MOVA after Rearden lost ownership in 2012 are a copyright registration filed in 2016 (in the midst of the ownership litigation described below), 3-ER-426-429, and a *nunc pro tunc* assignment agreement created in 2019 (in the midst of this litigation), 3-SER-401-403.

### 2. *WDP Had No Practical Ability To Recognize, Or To Resolve, A MOVA Ownership Dispute During Filming*

When DD3 used MOVA to perform facial-motion captures for *BATB* in 2015 and 2016, WDP had no reason to question DD3's right to use the software. Rearden had authorized DD3 to use MOVA on WDP films in 2010 and 2012. 3-ER-304-305; 2-SER-249:14-19. For *BATB*, DD3 used the same equipment, operated by the same technician (Mr. LaSalle) as on the earlier movies. 2-SER-394; 2-SER-249:20-22. As with the earlier films, WDP contracted directly with DD3, not with MOVA or any other rights holders for technology DD3 used, and required DD3 to represent and warrant it had all necessary rights to use all technology on the film. 4-ER-762.

-15-

**F.     The SHST Litigation And Rearden's Later Lawsuits Against WDP And Other Studios**

On February 20, 2015, DD3's affiliates—initially Shenzhenshi Haitiecheng Science and Technology Company ("SHST") and later Virtue Global Holdings ("VGH")—sued Rearden, seeking a declaration they owned the MOVA assets.  3-ER-341:2-13; 3-ER-342:5-6.  Rearden counterclaimed, seeking a declaration that it owned MOVA.  3-ER-342:1-4.  A bench trial was held in December 2016.  3-ER-342:7-11.

While that decision was pending, in July 2017, Rearden filed lawsuits against three motion picture studios (WDP, Twentieth Century Fox, Paramount Pictures) and video game maker Crystal Dynamics, in connection with seven movies and one video game.  *See* 1-SER-133-142.[2]  The premise of these suits was that Rearden owned MOVA and had not authorized DD3's use on those works.

The decision in the SHST case issued on August 11, 2017, nearly five months after *BATB*'s release.  2-ER-106-107.  The court ruled that Rearden owned the MOVA assets, but not on the ground MO2 was a Rearden subsidiary (Rearden's theory in this lawsuit).  The court instead ruled that Mr. LaSalle had created MO2 and received the MOVA assets while still a Rearden employee and

---

[2] *See also Rearden LLC v. Twentieth Century Fox Film Corp.*, Case No. 4:17-CV-04191-JST (N.D. Cal.), ECF No. 1; *Rearden LLC v. Paramount Pictures Corp.*, Case No. 4:17-CV-04192-JST (N.D. Cal.), ECF No. 1; *Rearden LLC v. Crystal Dynamics, Inc.*, Case No. 4:17-CV-04187-JST (N.D. Cal.), ECF No. 1.

that the assets transferred to Rearden pursuant to Mr. LaSalle's employment agreement. 2-ER-107; *SHST v. Rearden LLC*, No. 15-cv-00797-JST, 2017 WL 3446585, at *8 (N.D. Cal. Aug. 11, 2017). Rearden then dismissed its copyright and other claims against VGH, *SHST v. Rearden, LLC*, No. 15-cv-00797-JST (SK) (N.D. Cal.), ECF No. 456, and continued pursuing its cases against the studios and Crystal Dynamics.

After substantial motion practice in this case, Rearden proceeded to trial on only its vicarious copyright infringement claim regarding *BATB*.



**Figure 8:** Timeline of events described above.

## II. THE DISTRICT COURT'S RULINGS AT ISSUE ON APPEAL

### A. The District Court's Motion *In Limine* Rulings

#### 1. *Exclusion of Rearden's Expert Apportionment Opinions*

Rearden proffered as an expert on its profits claim Philip Fier, a financial consultant with film finance and distribution experience. Based solely on his

experience and watching the movie once through, Mr. Fier purported to assign precise percentages reflecting the extent to which MOVA contributed to each of 16 drivers of audience interest in seeing the movie (such as seeing Emma Watson play Belle); Mr. Fier used those percentages to derive a portion of profits purportedly attributable to MOVA. 4-ER-608-614.

The district court granted WDP's motion to exclude Mr. Fier's apportionment opinions for two independent reasons. First, the court found that Mr. Fier "fail[ed] to ground his apportionment analysis in any coherent methodology." 1-ER-28:23-24. Rather, "to put it plainly, he watched the movie once and came up with some numbers." 1-ER-27:12-13. Second, although Mr. Fier purportedly selected his percentages based on his experience, he failed to explain how his experience in film finance and distribution (not computer graphics or film production) enabled him to discern MOVA's contribution to *BATB*. 1-ER-29:13-16.

## 2. *Exclusion of DD3 Indemnification Agreement*

The district court also excluded, pursuant to Federal Rule of Evidence 403, evidence of DD3's agreement to indemnify WDP's production affiliate in its contract for work on the film. 4-ER-762. The district court found that "the risk of confusion or unfair prejudice outweighs any probative value." 1-ER-22:21-22.

**B.      The District Court's Grant Of Motion To Strike The Jury Demand**

On October 23, 2023, the district court granted WDP's motion to exclude Rearden's actual damages expert, 2-ER-243, then granted WDP's motion for summary judgment on Rearden's claim for actual damages, 4-ER-743, such that Rearden's profits claim was then its only remaining damages claim.

Days later at the pretrial conference, WDP raised that Rearden lacked a jury-trial right as to this remedy. 1-SER-145:8-146:10. Without objection from Rearden, the parties agreed to a schedule to brief this issue, 1-SER-55, and WDP filed its motion on November 1, 2023, arguing that neither 17 U.S.C. § 504(b) nor the Seventh Amendment created a jury trial right. 1-SER-40-54. Rearden opposed the motion on its merits, asserted no procedural objections, and, in the alternative, requested an advisory jury. 1-SER-14-39. Rearden also sought reconsideration of the court's exclusion of its actual damages expert.

Shortly before trial, the district court granted Rearden's motion to reconsider the actual damages ruling and allowed Rearden to proceed on that claim. 2-ER-82. The court denied WDP's motion to strike the jury demand "as moot." *Id.*

While Rearden was presenting its case-in-chief, and before Rearden called its damages expert, the district court announced its *sua sponte* determination that it had erred in denying the motion to strike the jury demand as moot. 3-ER-352:11-

-19-

15. The court said it was "very close to concluding that there is no[] [jury trial] right." 3-ER-352:16-17. Rearden raised no objections. *See* 3-ER-354:2-4.

The district court then issued a written order striking the jury demand on Rearden's claim for profits. 1-ER-19-21. The court held that Section 504(b) does not create, and there is not under the Seventh Amendment, a right to have this remedy determined by a jury. *Id.* The court granted Rearden's request for an advisory jury. 1-ER-21. Rearden raised no objections when that order issued or through the rest of trial, and never asked to be able to supplement or alter its trial presentation before the advisory jury returned its verdict.

### C.    The District Court's Grant Of Judgment As A Matter Of Law

During trial, WDP moved for judgment as a matter of law, arguing that, among other failures, Rearden had not presented sufficient evidence that WDP had the practical ability to control the infringing conduct, as opposed to a legal right to control DD3's services on the film generally. 1-ER-9:1-5. After the district court entered judgment, WDP renewed its motion. *Id.*

After "consider[ing] whether Rearden introduced at trial sufficient evidence that [WDP] had the ability to identify, and therefore police, DD3's infringing conduct in using MOVA," the district court granted the motion. 1-ER-11:8-17. The court had denied summary judgment based on "Rearden's representations as to what evidence it *could* present at trial," but found that the evidence at trial was not

sufficient to establish the "requisite control" element. 1-ER-11:21; 1-ER-13:4-17. The court granted judgment as a matter of law on Rearden's vicarious infringement claim for WDP. 1-ER-13:14-17.

## SUMMARY OF THE ARGUMENT

The district court properly granted judgment as matter of law. Rearden failed to present evidence of WDP's *practical ability* to control DD3's infringement—its copying of MOVA software into computer RAM during a period in which a court years later held Rearden owned MOVA—as opposed to its legal right to control DD3's services.

The district court did not err in striking Rearden's jury demand with respect to indirect profits under Section 504(b). Section 504(b) does not provide, and the Seventh Amendment does not guarantee, a jury trial right for this equitable remedy. In any event, Rearden failed to preserve its objections, and any error was harmless because the district court submitted the profits question to an advisory jury—as Rearden requested—and adopted the advisory verdict.

The district court did not abuse its discretion in rendering the evidentiary rulings Rearden challenges. The court properly excluded Mr. Fier's apportionment opinions, which were not grounded in any methodology or in his professional experience. The court also properly excluded evidence of an indemnification agreement that had no probative value and risked juror confusion.

## ARGUMENT

**I.**  **THE DISTRICT COURT PROPERLY GRANTED JUDGMENT AS A MATTER OF LAW ON REARDEN'S VICARIOUS COPYRIGHT INFRINGEMENT CLAIM**

To establish vicarious liability for copyright infringement, Rearden had to prove that WDP "ha[d] *both* a legal right to stop or limit the directly infringing conduct, as well as *the practical ability to do so*." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007) (emphasis added). This standard focuses on the defendant's practical ability to actively supervise *the infringing conduct*, *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 746 (9th Cir. 2019), not just the *infringer*. There was not a "legally sufficient evidentiary basis" for a "reasonable jury" to find for Rearden on this issue. Fed. R. Civ. P. 50(a)(1).

### A.  The Practical Ability To Control A Third Party's Infringement Requires A Practical Way To Recognize Infringement

Rearden first faults the district court's construction of the applicable legal standard. Br. 19-22. The court properly interpreted numerous decisions of this Court and others holding that, to have a "practical ability to control" a third party's infringement, a party must be able to recognize that infringement is occurring. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023-24 (9th Cir. 2001); *Perfect 10*, 508 F.3d at 1174; *VHT*, 918 F.3d at 746.

Rearden urges the Court to dismiss these cases because they involved "the limitations of . . . *cloud server software*," not at issue here. Br. 21-22. The Court's

prior decisions are not so cabined, nor does this distinction make doctrinal sense.

The principle that a party must be able to *identify* the infringing conduct to be vicariously liable traces back to the seminal case of *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963). There, the Second Circuit held a department store was vicariously liable for an in-store concessionaire's sales of bootleg recordings. *Id.* at 308. In characterizing the bounds of vicarious liability, the court described a spectrum of control: At one end is the typical landlord, who lacks the practical ability to police a tenant's infringement; at the other is an employer, who has the practical ability to supervise its employees' conduct. *Id.* at 307-08; *accord Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996). *Shapiro* held that the department store-concessionaire relationship was closer to the employer-employee relationship because the store could "police carefully the conduct of its concessionaire." 316 F.2d at 308. The court reasoned that the store was "in a position to" police this conduct because the concessionaire's "'bootleg' recordings" were "somewhat suspicious on their face," bearing "no name of any manufacturer upon the labels or on the record jackets, as is customary in the trade." *Id.* at 308-09.

The decisions of this court and others since *Shapiro* have assessed "practical ability to control" in light of the feasibility of recognizing that infringement is occurring. In *Fonovisa*, for example, this Court held that the plaintiff had

-23-

sufficiently alleged a swap meet operator had the practical ability to control vendors' sales of counterfeit recordings because the operator "controlled and patrolled" the vendors' booths. 76 F.3d at 262. There was "no dispute" that the swap meet organizer had the ability to recognize that "vendors in their swap meet were selling counterfeit recordings," because law enforcement had previously raided the swap meet for counterfeit recordings and a private investigator had recently "observed sales of counterfeit recordings." *Id.* at 261.

Similarly, in *Napster*, this Court distinguished between what Napster could and could not recognize as infringing in defining the scope of its vicarious liability, noting that "the boundaries of the premises that Napster 'controls and patrols' are limited." 239 F.3d at 1023 (citation omitted). The Court held that Napster could be vicariously liable with respect to file name indices because Napster "ha[d] the ability to locate infringing material" on these indices, which included names of copyrighted material. *Id.* at 1024. By contrast, Napster did not have the ability to police the *contents* of files because "the Napster system does not 'read' the content of indexed files." *Id.*

This Court again applied this distinction in *Perfect 10* and *VHT*. *Perfect 10* held that Google lacked the practical ability to control third-party websites' use of infringing images where Google could not reasonably "'determine whether a certain image on the web infringes someone's copyright.'" 508 F.3d at 1174

(citation omitted).  And *VHT* held that Zillow could not police users' uploading of infringing photographs because "there was insufficient evidence that Zillow had the technical ability to screen out or identify infringing . . . photos among the many photos that users saved or uploaded daily."  918 F.3d at 746.  Once a user uploaded a photograph to Zillow with an "appropriate certification of rights, ferreting out claimed infringement . . . was beyond hunting for a needle in a haystack."  *Id.*

Rearden's claim that looking for a "needle in a haystack" is a problem only in the cloud-computing context, Br. 22; *VHT*, 918 F.3d at 746, ignores not just *Shapiro* and *Fonovisa*, but other cases that do not involve cloud software.  For example, in *Adobe Systems Inc. v. Canus Productions, Inc.*, 173 F. Supp. 2d 1044 (C.D. Cal. 2001), Adobe sued a trade show operator whose exhibitors were selling unlicensed copies of Adobe software.  *Id.* at 1054-55.  That the operator had security guards patrolling the premises made it in part like the *Fonovisa* defendant. *Id.*  But *Adobe* held there was no practical ability to control the infringement because, with only 20 security guards, the trade show operator lacked "the practical ability to police the content of up to 450 vendors' booths" to locate the approximately "100 unauthorized items" (out of thousands of total items sold).  *Id.* at 1054.  Further, it was "not possible [for the defendant's security guards] to identify what software infringed [plaintiff] Adobe's copyright without training and information that . . . only Adobe possessed," and the trade show operator thus had

no "power to recognize" unauthorized products or "control the infringing behavior." *Id.* at 1055; *see also Artists Music, Inc. v. Reed Publ'g (USA), Inc.*, No. 93 CIV 3428 (JFK), 1994 WL 191643, at *6 (S.D.N.Y. May 17, 1994) (trade show operator could not reasonably police exhibitors' infringing use of music where the operator would have needed "to hire several investigators with the expertise to identify music, to determine whether it was copyrighted, to determine whether the use was licensed, and finally to determine whether the use was a 'fair use'").

Rearden also is wrong that requiring an alleged vicarious infringer to be able to recognize infringing conduct conflates direct or contributory infringement with vicarious liability. Br. 26-27. Even without engaging directly in the infringing conduct, a defendant may still have an opportunity to recognize infringement on premises under its control. *See, e.g., Fonovisa*, 76 F.3d at 262; *Napster*, 239 F.3d at 1023-24. Likewise, an opportunity to recognize infringement is different from actual knowledge of infringement. This Court has described vicarious liability as encompassing a situation where a defendant "turn[s] a blind eye to detectable acts of infringement for the sake of profit." *Napster*, 239 F.3d at 1023.

Accordingly, the district court applied the "practical ability to control" prong in a manner consistent with the case law. The district court correctly reasoned that "in order to control infringing conduct, one must be able to *identify* the infringing conduct." 1-ER-9:3-4.

## B. Rearden Failed To Introduce Sufficient Evidence That WDP Had The Practical Ability To Control DD3's Infringement

Rearden also faults the district court's application of the above precedents to the record of an 11-day trial over which the court presided. Rearden's arguments do not address the evidentiary deficiencies the district court identified.

### 1. *Legal Rights Regarding DD3's Services Do Not Establish A Practical Ability To Control The Infringing Conduct*

Rearden's primary argument is premised on the contract between DD3 and WDP's affiliate Chip Pictures—specifically, Chip Pictures' contractual rights to terminate DD3's services, to request changes to DD3's work, and to review in-progress shots. Br. 22-24.

This argument confuses WDP's *legal* rights regarding DD3's services on *BATB* with the studio's *practical ability* to recognize and to control the infringement. This Court's precedents are clear that the practical ability to control involves more than the legal right to "supervise." *Perfect 10*, 508 F.3d at 1173 (vicarious liability requires "*both* a legal right to stop or limit the directly infringing conduct, *as well as* the practical ability to do so" (emphasis added)). In *Napster*, for instance, it was not enough that Napster expressly retained the right to refuse service and terminate accounts. 239 F.3d at 1023-24. Rather, Napster's "'right and ability' to police [was] cabined by the system's current architecture." *Id.* at 1024 (citation omitted). Similarly, Chip Pictures' legal right to terminate

DD3's contract if DD3 infringed copyrights does not establish a practical ability to recognize that DD3 did not have rights to use MOVA. The control prong of the vicarious liability test requires *both*. *See VHT*, 918 F.3d at 746 (even though Zillow had the right to remove photographs uploaded to Digs, there was no vicarious liability because Zillow lacked the practical ability to discern which photographs were infringing).

### 2. The Mere Presence Of Mr. Condon And Mr. Gaub At Capture Sessions Does Not Establish A Practical Ability To Control The Infringing Conduct

Rearden next argues that the presence of director Bill Condon and visual-effects supervisor Steve Gaub at facial-motion capture sessions was sufficient to establish that WDP had the practical ability to control DD3's infringement. Br. 25-27. But the evidence showed only that Mr. Condon and Mr. Gaub attended facial-motion capture sessions, and that they later reviewed footage of Mr. Stevens's performance in standard QuickTime format to determine which takes of a particular shot should be used to animate the Beast. 3-ER-397-399. Viewed in the light most favorable to Rearden, this evidence did not establish a practical ability to recognize or to control DD3's infringing use.[3]

---

[3] Rearden faults the district court for finding that Mr. Condon's and Mr. Gaub's involvement in motion-capture sessions presented a triable issue at summary judgment, and then concluding Rearden presented insufficient trial evidence. Br. 26. The district court properly analyzed different issues on different records at each stage. *See Dupree v. Younger*, 598 U.S. 729, 734 (2023) (facts "develop and

Critically, Rearden failed to present evidence that DD3's infringing *use of MOVA software* was "within the 'premises' that [WDP had] the ability to police." *Napster*, 239 F.3d at 1024. There was no evidence that Mr. Condon or Mr. Gaub, or anyone affiliated with WDP, was involved with DD3's operation of the software or was even present when DD3 processed MOVA data. 2-SER-254:14-23; 2-SER-255:19-257:20; 2-SER-358-359; 1-SER-190:8-192:1.

Rearden also failed to present evidence that Mr. Condon, Mr. Gaub, or any individual affiliated with WDP "ha[d] the ability to locate infringing material" in connection with DD3's use of MOVA software. *Napster*, 239 F.3d at 1024. In discussing the evidence of Mr. Condon's involvement, Rearden adds that the first frame of each "MOVA file" was marked with its copyright notice. *See* Br. 26 (citing 3-ER-346:9-347:3; 3-ER-430). But there was no evidence at trial that Mr. Condon or anyone affiliated with WDP ever saw this notice. Nor was there any evidence that Mr. Condon, Mr. Gaub, or anyone affiliated with WDP ever viewed the tracked mesh output of DD3's use of MOVA; they viewed only reference-camera footage from the capture sessions or more finished shots that incorporated DD3's retargeting and animation work. 1-SER-190:8-192:1; 2-SER-255:19-257:20. It was uncontroverted that DD3 removed the frame with the copyright

---

clarify as the case progresses from summary judgment to a jury verdict," such that "after trial, a district court's assessment of the facts based on the summary-judgment record becomes 'ancient history . . . .'").

notice before it sent any QuickTime video files to Mr. Condon, Mr. Gaub, or any individuals affiliated with WDP after the capture sessions, so that the frames-per-second lined up. 2-SER-398-399. And even if anyone from WDP had seen such a notice, there was no evidence they could have recognized merely from seeing the notice that there was an ownership dispute or that DD3 lacked proper authorization to use the software. *See VHT*, 918 F.3d at 746 ("ferreting out claimed infringement" under such circumstances goes "beyond hunting for a needle in a haystack"); *Adobe*, 173 F. Supp. 2d at 1055 (no practical ability to control where it was "not possible to identify what software infringed Adobe's copyright").

### 3. *Rearden Did Not Present Sufficient Evidence At Trial That WDP Had A Practical Ability To Recognize The Infringing Conduct Was Occurring*

Finally, Rearden argues WDP "knew enough to have investigated DD3's use of MOVA"—impliedly accepting the practical ability standard supported by the case law and applied by the district court. Br. 27-30. None of the cited evidence provides a legally sufficient basis for a jury to find that WDP had a practical ability to recognize, and thus to control, DD3's infringing conduct in this case.

*First*, Rearden claims based on *pre-2012* news coverage, meetings, and use of MOVA on films, WDP should have known Rearden owned MOVA and Rearden's affiliate, OnLive, was the only authorized provider of MOVA services. Br. 27-28. This argument ignores entirely the stipulated fact that Rearden *lost*

ownership of MOVA in August 2012, 2-ER-106, and that WDP affiliates had been approached about acquiring or licensing the MOVA assets from entities other than Rearden in both 2012 and 2013, 2-SER-388-389; 2-SER-397-398. If WDP had any knowledge after 2012, it was that Rearden no longer owned MOVA. None of the evidence at trial showed otherwise.

*Second*, Rearden argues that WDP could have performed due diligence into DD3's right to use MOVA software. Br. 28-29. Based on phone calls that Mr. Perlman had received from studios requesting patent and trademark registration numbers and a 2011 MPA document titled "Content Security Best Practices Common Guidelines,"[4] Rearden claims that a studio, upon hiring a vendor to provide services like facial-motion capture, should have satisfied itself that the vendor had the necessary authority to use the technology involved in providing its services. *Id.*

The evidence at trial, however, showed WDP had no reason to believe anything was amiss. The evidence was undisputed that when WDP hired DD3, the same person was using the same (large and conspicuous) specialized hardware to

---

[4] This document concerned practices for ensuring against leaks of movies by studio vendors; the document did not discuss practices or procedures to ensure that vendors had licenses for the software tools they use in performing their services. 2-SER-220:11-21. Plaintiffs' expert, Mr. Fier, admitted he had never heard of the MPA document being used to investigate intellectual property ownership as opposed to anti-piracy and security practices. 2-SER-220:11-221:21.

provide the same MOVA services as had been the case before Rearden lost ownership in 2012. 2-SER-394-395. And, as on previous films, WDP contracted with DD3 and not with Rearden or other rights holders in particular technologies. 3-ER-306:18-22; 1-SER-172:6-14; 2-SER-249:10-19. There thus was no reason for WDP to question DD3's provision of MOVA services. 2-SER-249:20-22. Mr. Perlman, by contrast, discovered that DD3 was using MOVA in 2014, but chose not to let anyone at WDP know he believed DD3's use was unauthorized—until *BATB* had broken box-office records and Rearden filed this lawsuit seeking a portion of the movie's profits. 1-SER-172:2-175:9; 1-SER-176:25-178:23; 2-ER-172.

The trial evidence further showed that even if WDP had investigated DD3's right to use MOVA, WDP would not have found a single piece of paper evincing Rearden's ownership claim and would not have been able to determine that DD3 was infringing copyright. Mr. Perlman asserted that in the past, he had provided unnamed studio employees with patent or trademark registration numbers by phone. *See* 3-ER-308:9-310:21; 2-SER-179:18-23. Had WDP made a similar phone call when it hired DD3 or during *BATB*'s filming, Mr. Perlman could not have provided a registration number: Rearden did not register the copyright for MOVA Contour software until February 2016, months after principal photography ended. 3-ER-426-429; 1-SER-170:6-12; 2-SER-225:21-226:3.

Likewise, had WDP sought documentation confirming DD3 or its affiliate had rights to use MOVA, DD3 could have provided agreements transferring the MOVA assets from OL2 to MO2 and from MO2 to DD3's affiliate. *See* 3-SER-532-562; 3-ER-340:21-341:13; *see also* 2-ER-106. Rearden itself lacked any document that purported to evidence a transfer of the MOVA Contour software to Rearden until *2019*—years after *BATB*'s release and after it initiated this lawsuit—when Rearden created a "*nunc pro tunc* assignment." 1-SER-156:16-157:9; 1-SER-167:22-168:6; 3-SER-401-403. And it was not until August 11, 2017, months after *BATB*'s release, that the court in the SHST case issued its decision that Rearden owned the MOVA assets during the relevant period. 1-SER-149:12-15. Thus, the trial evidence showed that even if WDP had undertaken the impractical investigation Rearden advocates, WDP would not have been able to recognize that DD3's use was infringing.

The trial evidence also showed that it would be wildly impractical for a studio to conduct due diligence into every piece of software and technology used by every vendor on a large-scale production. *BATB* involved nearly a thousand people and hundreds of vendors, each of which utilized dozens of technologies. 3-ER-357:16-18; 2-SER-228:12-14; 2-SER-250:9-11. DD3 was one of four visual-effects companies and it alone used at least 30 different software tools *other than MOVA* just for its work on the Beast. 2-SER-245:3-5; 2-SER-250:9-17. The

evidence was undisputed that vendors use numerous types of specialized software and hardware, as well as the basic software programs that businesses use for email, word processing, etc.  2-SER-242:15-20; 2-SER-247:16-21.  Studios do not have the practical ability to determine if each of those uses is authorized, and there was no evidence showing that it is customary in the industry for a studio to conduct that type of inquiry.  2-SER-248:21-24; 2-SER-261:15-262:10.

To sidestep this impracticality, Rearden mischaracterizes the district court's opinion as relying solely on the number of vendors who worked on *BATB*, a number Rearden claims was "heavily padded."  Br. 31-33.  Rearden misses the point:  Its vicarious liability theory would require a studio to conduct intellectual property due diligence into every vendor's—not just visual-effects vendors'—rights to use every piece of software and technology.  On Rearden's theory, even if a vendor's paperwork confirmed its authorization to use a particular software, a studio would have to scour the press for indications of a possible dispute, Br. 29-30, and to resolve any apparent ownership dispute in favor of the party that has no contemporaneous documentary evidence to support its claim, *see* discussion, *supra*, at 32-33.  This is not practical and goes well "beyond hunting for a needle in a haystack."  *VHT*, 918 F.3d at 746.  The Court should reject Rearden's capacious vicarious liability standard and affirm the grant of judgment as a matter of law.

-34-

## II.  IT WAS NOT ERROR TO PROCEED WITH AN ADVISORY JURY ON REARDEN'S PROFITS CLAIM

### A.  Rearden Had No Right To A Trial By Jury On Its Profits Claim

The district court properly found that neither Section 504(b) nor the Seventh Amendment provides a jury-trial right with respect to disgorgement of profits.

There is no controlling Supreme Court or Ninth Circuit decision on this question, but authority has trended towards finding no jury-trial right.  In *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), the Supreme Court characterized "disgorgement of unjust gains" as "equitable relief" in at least some and possibly all cases under Section 504(b).  *Id*. at 668 & n.1, 686.  More recently, multiple district courts have thoroughly analyzed the statutory and Seventh Amendment issues and held there is no jury-trial right on the profits remedy.  *See Navarro v. Procter & Gamble Co.*, 529 F. Supp. 3d 742, 748-49 (S.D. Ohio 2021); *Fair Isaac Corp. v. Fed. Ins. Co.*, 468 F. Supp. 3d 1110, 1118 (D. Minn. 2020); *Assessment Techs. Inst., LLC v. Parkes*, No. 19-2514-JAR, 2022 WL 588889, at *2-3 (D. Kan. Feb. 25, 2022).  And the Federal Circuit reached a similar conclusion in determining that disgorgement of profits for patent, trademark, or copyright infringement is an equitable remedy.  *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1324 (Fed. Cir. 2018).

This Court should follow these cases in reaching a similar decision.

-35-

### 1. *Section 504(b) Of The Copyright Act Does Not Authorize A Jury Trial On Defendant's Profits*

Nothing in the text or structure of the Copyright Act evinces Congress's intent to create a jury-trial right for the inherently equitable profits remedy.

There is no right to a jury trial on a federal statutory claim where the statute sets forth no "express . . . right" and there is "no evidence of congressional intent to grant the right to a jury trial." *Adams v. Cyprus Amax Mins. Co.*, 149 F.3d 1156, 1159 (10th Cir. 1998); *see Tull v. United States*, 481 U.S. 412, 417 & n.3 (1987) (no statutory right where "[n]othing in the language of" the statute "or its legislative history implies any congressional intent" to have issue tried by jury). Here, there is neither.

Nothing in the text of the Copyright Act shows that Congress intended to authorize a jury trial for disgorgement of profits. Section 504(b) makes no reference to a jury trial on the infringer's profits. Neither does the rest of Section 504, the remedies section of Title 17, 17 U.S.C. § 501 *et seq.*, nor the rest of the Copyright Act contain such a reference.

Section 504(b)'s legislative history further confirms that Congress did not intend for a jury, rather than a court, to decide the profits issue. To the contrary, in discussing the "profits attributable to the infringement" language in Section 504(b), the House Report accompanying the 1976 Copyright Act referred to the role of *the court* in making this determination: "where some of the defendant's profits result

-36-

from the infringement and other profits are caused by different factors, *it will be necessary for the court to make an apportionment*." H.R. Rep. No. 94-1476, at 161 (1976) (emphasis added); *see also Fair Isaac Corp.*, 468 F. Supp. 3d at 1118 (discussing same legislative history and finding no statutory right to a jury trial).

Most courts considering the issue therefore have found no statutory right to a jury trial for profits under Section 504(b). *Navarro*, 529 F. Supp. 3d at 749 ("[W]hether viewed purely as a textual matter, or in light of the legislative history of the current incarnation of the Copyright Act, or in light of the historical development behind it, the Court finds that there is no statutory right to a jury under the Copyright Act."); *Assessment Techs. Inst., LLC*, 2022 WL 588889, at *2 (same); *Fair Isaac Corp.*, 468 F. Supp. 3d at 1114 (same); *Bertuccelli v. Universal Studios LLC*, No. CV 19-1304, 2021 WL 2227337, at *2 (E.D. La. June 2, 2021) (same).[5] These courts are correct. "When Congress wants to create a right to trial by jury, it knows how to say so," *Navarro*, 529 F. Supp. 3d at 748, and Congress's failure to do so here resolves the question.

Rearden concedes that Section 504(b) does not expressly state that profits are a jury issue. Br. 42. It asks this Court to conclude otherwise based on two

---

[5] At least one district court in the Ninth Circuit reached the Seventh Amendment question without ruling on the statutory issue. It concluded that there was no right to a jury trial on an accounting for profits between two parties that the court had determined were co-owners of a copyright. *Siegel v. Warner Bros. Ent. Inc.*, 581 F. Supp. 2d 1067, 1071 (C.D. Cal. 2008).

unpublished district court decisions that reached the opposite conclusion of the reasoned authorities discussed above: *Huffman v. Activision Publishing, Inc.*, No. 2:19-CV-00050-RWS-RSP, 2021 WL 2339193 (E.D. Tex. June 8, 2021), and *Capture Eleven Group v. Otter Products, LLC*, No. 1:20-CV-02551-CNS-KLM, 2023 WL 5573966 (D. Colo. May 31, 2023). *See* Br. 44-48. Respectfully, *Huffman* and *Capture Eleven* do not withstand analysis.

*First*, both decisions erred in placing significant weight on the fact that Section 504(b) "combin[es] both 'actual damages' (an indisputably legal remedy) and 'any profits of the infringer' within the same statutory provision." *Capture Eleven*, 2023 WL 5573966, at *2 (citing and quoting *Huffman* for this proposition). But the mere fact that a statute provides for both legal and equitable remedies does not evince Congress's intent for the jury to decide both forms of relief. The Supreme Court has rejected such reasoning, holding that Section 1983 does not create a statutory jury right, even though the statute authorizes an "action at law." *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 708 (1999).

*Second*, neither *Huffman* nor *Capture Eleven* addresses the legislative history showing that Congress intended for "*the court* to make an apportionment" of profits. *See* H.R. Rep. No. 94-1476, at 161 (emphasis added).

-38-

*Third*, both decisions overread dicta from the Supreme Court's *Feltner* decision in concluding that Congress purposely omitted reference to "the court" in Section 504(b) to create a jury right. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998), held that Congress did not intend to create a jury right to determine statutory damages under Section 504(c). *Id.* at 345. (The Court went on to hold that there is a Seventh Amendment right to a jury trial on all issues pertinent to statutory damages, including the amount of the statutory award itself. *Id.* at 355.) In reaching its conclusion on the question of what Congress intended, *Feltner* noted "the Copyright Act does not use the term 'court' in the subsection addressing awards of actual damages and profits, see § 504(b), which generally are thought to constitute legal relief." *Id.* at 346. From that statement, *Capture Eleven* and *Huffman* leap to the conclusion that the lack of reference to "the court" in Section 504(b) shows Congress intended to create a jury-trial right for all forms of relief authorized by that provision.

As the Federal Circuit has explained, however, the cases *Feltner* cited in support of its "legal relief" statement "related to only 'damages,' not 'profits.'" *Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1325 n.11. The passing statement from *Feltner* is contrary to the Supreme Court's Seventh Amendment jurisprudence, which holds generally that the "'disgorgement of improper profits'" is an equitable remedy. *E.g.*, *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v.*

-39-

*Terry*, 494 U.S. 558, 570 (1990) ("[W]e have characterized damages as equitable where they are restitutionary, such as in 'action[s] for disgorgement of improper profits.'").

*Fourth*, *Capture Eleven* and *Huffman* erred in failing to weigh the fact that a profits remedy historically has been equitable. As the Supreme Court has explained, prior to the enactment of the 1909 Copyright Act, "there had been no statutory provision for the recovery of profits, but that recovery had been allowed *in equity* both in copyright and patent cases." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940) (emphasis added). Thus, in passing the Copyright Act, "the apparent intention of Congress was to assimilate the remedy with respect to the recovery of profits to that already recognized in patent cases." *Id.* at 400. "And in both the trademark and copyright contexts, the theoretical justification for awarding profits was based on an analogy to the equitable remedy of a constructive trust, also called a trust *ex maleficio*." *JL Beverage Co. v. Jim Beam Brands Co.*, 815 F. App'x 110, 115 (9th Cir. 2020) (Friedland, J., concurring).

"Given its history as a form of equitable relief, there is little reason to believe that Congress would have intended, by implication, to create a jury-trial right when it added this relief to the statute." *Navarro*, 529 F. Supp. 3d at 748. Neither *Capture Eleven* nor *Huffman* provide any basis to conclude otherwise.

*Lastly*, Rearden argues that there must be a statutory jury-trial right because (1) pattern jury instructions in four Circuits (including the Ninth) have instructions relating to awards of profits, and (2) a number of district courts have sent the profits question to juries. Br. 50.

As the Courts of Appeal routinely note, pattern instructions are only "suggestions . . . and are of course not binding," *United States v. Grover*, 485 F.2d 1039, 1042 n.5 (D.C. Cir. 1973), because they are "not controlling law and can be incorrect," *S.E.C. v. Quan*, 817 F.3d 583, 593 (8th Cir. 2016). That is why "it is preferable to look to case law." *United States v. Gardner*, 417 F. Supp. 2d 703, 710 (D. Md. 2006). As explained, case law makes clear there is no statutory right to a jury trial on a profits claim under Section 504(b).

Rearden's argument about a "widespread practice" of submitting infringer's profits to a jury is similarly irrelevant. Br. 50-51. Rearden ignores that none of the cases cited in *Huffman* or Rearden's brief considered whether Section 504(b) requires a jury trial. These cases cannot be persuasive on an issue they did not address. And most of these cases pre-date *Petrella*, in which the Supreme Court characterized "disgorgement of unjust gains" under the Copyright Act as "equitable relief." 572 U.S. at 667-88 & n.1; *id.* at 686.

-41-

### 2. *There Is No Seventh Amendment Right To A Jury Trial On Profits*

Rearden also had no Seventh Amendment right to a jury trial on its profits claim.

The Seventh Amendment right is "narrow" and "'preserve[s] the basic institution of jury trial in only its most fundamental elements." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) (quoting *Tull*, 481 U.S. at 426). "To determine whether a particular claim invokes" the Seventh Amendment right, courts (1) "must 'compare the statutory action to the 18th-century actions brought in the courts of England prior to merger of the courts of law and equity,'" and (2) "must 'examine the remedy sought and determine whether it is legal or equitable in nature.'" *Id.* (quoting *S.E.C. v Rind,* 991 F.2d 1486, 1493 (9th Cir. 1993)).

A long line of cases establishes the general principle that "actions for disgorgement of improper profits are equitable in nature" and thus do not fall within the Seventh Amendment's limited guarantee. *Fifty-Six Hope Rd.*, 778 F.3d at 1075.

On the specific issue here, numerous courts have found that no Seventh Amendment right attaches to a copyright claim for a defendant's profits. *See Tex. Advanced Optoelectronic Sols.*, 895 F.3d at 1324-25 ("As for copyright and trademark infringement, we have seen no support for concluding that disgorgement

of profits was available at law for those wrongs."); *Navarro*, 529 F. Supp. 3d at 752 (conducting exhaustive review of history and concluding "there can be little question that [profits] awards [in actions for copyright infringement] are equitable, rather than legal"); *Fair Isaac*, 468 F. Supp. 3d at 1118 (same); *see also* Pamela Samuelson et al., *Recalibrating the Disgorgement Remedy in Intellectual Property Cases*, 100 B.U. L. Rev. 1999, 2057 (2020) (collecting scholarship concluding that an infringer's copyright profits is not a jury issue). These cases, and the district court here, were correct in so holding.

Although Rearden's brief does not address the Seventh Amendment analysis, Rearden cites *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.* ("*Krofft*"), 562 F.2d 1157 (9th Cir. 1977), *overruled on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020), which states in dicta that a claim for an accounting of profits under the 1909 Copyright Act triggered a Seventh Amendment right to a jury trial. *Id.* at 1175. *Krofft* should not control here. *Krofft* did not engage with the history of early copyright cases, in which courts of equity awarded an infringer's profits as a remedy. *See JL Beverage Co., LLC*, 815 F. App'x at 115-16 (Friedland, J., concurring) (describing the history of the profits remedy and how "*Krofft* was wrong to conclude that it is a legal remedy"). *Krofft* also is in tension with subsequent authority analyzing this issue. *Id.*

Recently, the Supreme Court, "[w]hile not faced with the Seventh Amendment question, . . . recognized the equitable nature of disgorgement for a particular tort involving intellectual property." *Tex. Advanced Optoelectronic Sols.,* 895 F.3d at 1324-25 & n.9 (discussing *Petrella*). In *Petrella*, the Supreme Court described the copyright plaintiffs' request for "disgorgement of unjust gains and an injunction" as "equitable relief"; the Court said that, "[g]iven the 'protean character' of the profits-recovery remedy . . . we regard as appropriate its treatment as 'equitable' in this case." *Petrella*, 572 U.S. at 667-68 & n.1. As the Nimmer treatise explains, *Petrella* "leaned towards treating profits on the equitable side of the ledger" and "[s]ubsequent authority has so held." 5 Nimmer on Copyright § 14.03. This Court should hold the same.

Finally, even if Rearden did have a right to a jury trial on its profits claim, this would not be a basis to reverse. "The erroneous denial of a jury trial in a civil case is subject to harmless error analysis." *Fuller v. City of Oakland*, 47 F.3d 1522, 1533 (9th Cir. 1995), *as amended* (Apr. 24, 1995). The denial is harmless if "no reasonable jury could have found for the losing party, and the trial court could have granted a directed verdict for the prevailing party." *Id.* (quoting *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985)). Because no reasonable jury could have found WDP vicariously liable for DD3's infringement, Section I.B, *supra*, at 27-34, any error was harmless.

## B. The District Court Properly Struck The Jury Demand And Exercised Its Discretion To Impanel An Advisory Jury

If the district court "on motion or on its own, finds that . . . there is no federal right to a jury trial" on "some or all of those issues" for which a plaintiff has demanded a jury, the district court may strike the demand. Fed. R. Civ. P. 39(a)(2). "'[A] court has the discretion to permit a motion to strike a jury demand at any time . . . .'" *Kingsbury v. U.S. Greenfiber, LLC*, No. CV 08-151 DSF (AGRx), 2013 WL 12121540, at *1 (C.D. Cal. Nov. 4, 2013) (quoting *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 226-27 (3d Cir. 2007)).

Rule 39(c)(1) further allows district courts to impanel an advisory jury on issues where there is no right to a jury trial. Fed. R. Civ. P. 39(c)(1). In opposing WDP's motion to strike the jury demand, Rearden requested that the district court impanel an advisory jury. 1-SER-37:20-38:22. Having found that Rearden did not have a right to a jury on its disgorgement of profits claim, the district court decided to impanel an advisory jury because the district court had already impaneled a jury to decide Rearden's claim for actual damages, and the advisory jury's findings would help the district court in making its findings and conclusions. 1-ER-21.

The district court's decision to impanel an advisory jury was committed to the district court's discretion. *Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1013 (9th Cir. 2010) (decision to consult an advisory jury is reviewed for abuse of discretion). Nevertheless, Rearden raises two procedural complaints with the

district court's decision to impanel an advisory jury: (1) that the district court's decision violated Federal Rules of Civil Procedure 38 and 39, and (2) that the district court erred by striking the jury demand in the middle of trial. Not only do these arguments fail on the merits, but Rearden waived them by failing to timely raise them before the district court below. And even if there was any error, it was harmless. Both the advisory jury and the district court found the same profits amount, and Rearden has not identified any prejudice.

### 1. The District Court's Decision Complied With Rules 38 and 39

Rearden claims the district court violated Rules 38 and 39 by even considering WDP's motion to strike the jury demand. Br. 34-35. Rearden argues that WDP "consented" to a jury trial on the profits claim by making a jury demand, so WDP could not "unilaterally" withdraw that consent. *Id.* at 35.

As an initial matter, Rearden waived this argument by failing to raise it at all before the district court. Generally, this Court "will not consider arguments raised for the first time on appeal . . . ." *Rose Court, LLC v. Select Portfolio Servicing, Inc.*, 119 F.4th 679, 688 (9th Cir. 2024). Rearden did not raise this argument in opposing WDP's motion to strike the jury demand. *See* 1-SER-14-39. Nor did Rearden raise this argument when the district court announced its decision to strike the jury demand, 3-ER-352:6-354:4, or in its post-trial briefing, *see* 1-SER-2-13.

As a result, the district court did not have the opportunity to address this argument and this Court should decline to do so in the first instance.

Even if the Court reaches the argument, it fails because it misreads Rules 38 and 39. Citing Rule 38(d), Rearden claims WDP could not withdraw its jury demand on the profits claim without all parties' consent. Br. 34. Rule 38(d), however, only precludes parties from withdrawing a "*proper* demand"—which is a demand "[o]n any issue *triable of right* by a jury." Fed. R. Civ. P. 38(b), (d) (emphases added). Rule 39(a) concerns the situation here, "when a jury trial has been demanded under Rule 38" on an issue as to which there is no federal right to a jury trial. In that instance, the case proceeds to a jury trial unless "the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial." Fed. R. Civ. P. 39(a)(2). That is what happened here: The district court found, following WDP's motion and the court's *sua sponte* reconsideration of its mootness decision, that there was no right to a jury trial on Rearden's profits claim. 1-ER-21.

*Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 39 F.4th 1113 (9th Cir. 2022), which Rearden fails to cite, is instructive. The defendant there made a jury demand but later moved to withdraw it, arguing there was no jury right on the issue because the parties had contractually waived a jury trial. *Id.* at 1115-17. The district court granted the motion, and this Court affirmed. *Id.* at 1117. On appeal,

the plaintiff argued that Rules 38 and 39 prevented the defendant from unilaterally withdrawing its jury demand.  *Id.* at 1119.  This Court disagreed, holding that Rule 39(a) specifically "allows a jury demand to be withdrawn" and that "a court may order a bench trial if it 'finds that on some or all . . . issues there is no federal right to a jury trial.'"  *Id.* at 1120-21 (quoting Fed. R. Civ. P. 39(a)(2)); *see also Fuller*, 47 F.3d at 1533 (stating, in dicta, that "[o]nce trial begins, [withdrawal of a jury demand] may occur . . . in compliance with the language of Rule 39(a)").  The Court should conclude the same here.

Moreover, even if WDP *had* "consented" to a nonadvisory jury under Rule 39(c)(2), the district court was not required to impanel such a jury.  *See Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 827 (2d Cir. 1994) ("[S]uch consent [does] not divest the trial judge of her discretion to decide the equitable issue.").  Rule 39(c) provides that the district court, "*may*, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right."  Fed. R. Civ. P. 39(c)(2) (emphasis added).  "Thus, when both parties consent, Rule 39(c) invests the trial court *with the discretion*—but not the duty—to submit an equitable claim to the jury for a binding verdict."  *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, No. SACV 12-00329 AG (JPRx), 2014 WL 12587050, at *2 (C.D. Cal. Dec. 16, 2014) (emphasis added), *aff'd*, 669 F. App'x 575 (Fed. Cir. 2016).  Here, the district court properly exercised its discretion to

impanel an advisory jury, rather than a nonadvisory jury.  *See Traxler*, 596 F.3d at 1013 (court reviews decision to consult an advisory jury for abuse of discretion).

### 2.   *The Court Did Not Err In Impaneling An Advisory Jury Before Submitting The Case To The Jury*

Rearden also argues that the district court erred in deciding to impanel an advisory jury in the middle of trial.  Br. 36.  Rearden fails to show that the district court committed any reversible error in impaneling an advisory jury—which it did at Rearden's own request.  *See* 1-SER-37:20-38:22.

Here, too, Rearden waived this argument by failing to timely raise it before the district court.  Rearden tries to get around this fact by emphasizing that the district court did not issue a written order striking the jury demand until after Rearden rested, even though the district court informed the parties of its tentative decision *before* Rearden rested.  *See* Br. 33 & n.4.  Nothing prevented Rearden from raising objections at that time or from asking for additional time or an opportunity to present its case in a different way.  3-ER-352:6-354:4.  Nor did Rearden raise any objection in the following days before the jury returned its verdict or at any other time before judgment.  It is too late for Rearden to make the argument now.  *See Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1007 (9th Cir. 2008) ("'[I]f a party fails to raise an objection to an issue before judgment, he or she waives the right to challenge the issue on appeal.'").

Rearden also fails to show any error. Rearden cites *Pradier v. Elespuru*, 641 F.2d 808 (9th Cir. 1981), for the proposition that the timing of the district court's ruling rendered it erroneous. Br. 36. But *Pradier* is distinguishable. The district court there ruled the parties had not made a proper jury demand because they had failed to comply with a local rule on the form of the demand. 641 F.2d at 810-11. The district court impaneled an advisory jury, but ultimately disregarded that verdict. *Id.* at 809. This Court reversed and remanded. *Id.* at 811. This Court held that the "advisory jury may not be substituted" on remand, because "[t]he entire trial took place with the understanding that the jury's verdict would be advisory only," and "[t]here are frequently significant tactical differences in presenting a case to a court, as opposed to a jury." *Id.* *Pradier* did not consider whether the time at which a district court strikes a jury demand might make it erroneous *per se*. *Pradier* is also inapposite here. Unlike *Pradier*, there is no difference between the advisory jury's verdict and the district court's verdict. *See* 2-ER-148-159.

Rearden also cites several out-of-Circuit cases for the proposition that the timing of the district court's decision constitutes "reversible error," Br. 37-38, but those cases are all distinguishable. In all of them, the parties had submitted the issue to the jury *before* the trial courts announced a change to an advisory verdict, without any party moving to strike a jury demand. *See Thompson v. Parkes*, 963

-50-

F.2d 885, 887 (6th Cir. 1992) (district court announced change to an advisory verdict a week after jury returned verdict); *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 52 (3d Cir. 1989) (district court indicated it would treat jury's verdict as advisory after jury returned verdict); *Thomas v. Broward Cnty. Sheriff's Office*, 71 F.4th 1305, 1311 (11th Cir. 2023) (district court characterized jury verdict as advisory only after jury returned verdict); *Hildebrand v. Bd. of Trs. of Mich. St. Univ.*, 607 F.2d 705, 707 (6th Cir. 1979) (district court announced change to advisory verdict *sua sponte* after both sides had rested); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 795-96 (5th Cir. 1999) (stating in dicta that the district court erred in suggesting that the jury's verdict was not binding after the court submitted the issue to jury).

The animating concern in all of these cases was that the district court had used the advisory jury to exercise "veto power" over a verdict with which the court disagreed. *See, e.g.*, *Thompson*, 963 F.2d at 887, 889 ("Rule 39(c) . . . permits the district court to try a case 'with an advisory jury,' not to have the case tried by a jury and essentially exercise a veto power."); *Thomas*, 71 F.4th at 1314 (reasoning that "[n]o . . . judicial veto power is hidden within Rule 39(c)," since it would not be right if "the district court could overwrite the jury finding whenever it disagreed"). Here, in contrast, WDP moved to strike the jury demand before trial, *see* 1-SER-40-54, and the Court told the parties it was granting the motion and

using an advisory jury before the case was submitted and before Rearden rested, *see* 3-ER-352:6-354:4.  And there is no "veto power" concern here because the district court ultimately adopted the advisory jury's verdict.  *See* 2-ER-148-149; 2-ER-150-159; *cf. Thomas*, 71 F.4th at 1315 ("The judgment should have been altered to reflect the jury finding.").

Furthermore, although it may be preferable to know the factfinder before trial, *see Pradier*, 641 F.2d at 811, numerous Circuits have held that this is not a basis to reverse, absent some demonstrable prejudice.  *See Merex A.G.*, 29 F.3d at 826-27 (not reversible error to declare the jury advisory *sua sponte* after plaintiff rested its case); *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 215 F.3d 182, 187-88 (1st Cir. 2000) (not reversible error to declare the jury advisory *sua sponte* at close of evidence but before submitting case to jury); *see also Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co.*, 195 F.3d 368, 375 (8th Cir. 1999) ("[F]ailure to give advance notice alone, absent some demonstrable prejudice to the complaining party, would not be a basis for reversal.").  This Court should join the First, Second, and Eighth Circuits in rejecting a *per se* rule of advance notice.

*Merex A.G. v. Fairchild Weston Systems, Inc.* parallels the situation here. After granting in part the defendant's motion for judgment as a matter of law during trial, the district court ruled that the remaining claim would go to the jury, but only for an advisory verdict.  29 F.3d at 823. The Second Circuit distinguished

*Thompson*, *Bereda*, *AMF Tuboscope*, and *Hildebrand*—the cases Rearden cites,

Br. 36-38—holding they did *not* stand for "a broad rule of law" that "a trial court

abuses its discretion whenever it declares the jury advisory after the start of trial."

*Merex A.G.*, 29 F.3d at 826-27. On the facts before it, the Second Circuit found it

"most significant[]" that the trial court "did not wait until the verdict was returned

before deciding that the verdict would be advisory. Accordingly, there was no

danger that the trial judge would veto the jury's verdict." *Id.* at 827. The Second

Circuit agreed that while "advance notice" is "preferable," "[i]n the absence of an

express statutory mandate," it was "not inclined to reverse on this basis alone, at

least absent some demonstrable prejudice to the complaining party." *Id.*

Here, similarly, Rearden has failed to show any prejudice. Rearden has not

explained what it would have done differently had the district court struck the jury

demand earlier. The record belies any suggestion, for instance, that Rearden would

have sought to introduce previously excluded evidence had it known the district

court would strike the jury demand.[6] Rearden's actual damages claim still

---

[6] The district court excluded Mr. Fier's apportionment opinions before WDP filed
the motion to strike the jury demand, and ruled on WDP's motion *in limine* to
exclude the indemnification agreement while the motion to strike the jury demand
was pending. *See* 1-SER-40-54; 1-ER-22; 2-ER-82. Rearden did not caveat its
request for an advisory jury with any request to introduce evidence that the district
court had excluded, or that it might exclude. *See* 1-SER-37-38. Rearden also
called Mr. Fier to the witness stand—twice—*after* the district court expressed its
likely intention to submit the apportionment of profits claim to an advisory jury.
*See* 2-SER-197:16-222:22; 2-SER-329:11-355:10.

proceeded before a binding jury.  Given that Rearden itself had *requested* that the district court impanel an advisory jury in the event that it struck the jury demand, 1-SER-37:20-38:22, Rearden cannot complain of any prejudice.

### 3. Even If The District Court Erred In Impaneling An Advisory Jury, This Court Should Affirm Or, Alternatively, Reinstate The Jury's Verdict

Even if the district court erred in striking the jury demand (and it did not), any error was harmless.  *Fuller*, 47 F.3d at 1533; *Ind. Lumbermens*, 195 F.3d at 378-79 (affirming even though the district court erred in declaring the jury advisory because any error was harmless); *Bonomi v. Gaddini*, 216 F. App'x 717, 718 (9th Cir. 2007) (questioning the district court's authority to ask for an advisory jury verdict but affirming because any error was harmless).  No reasonable jury could have found for Rearden on vicarious liability.  *See* Section I.B, *supra*, at 27-34.  This Court should therefore affirm.

But even if this Court were to conclude that the district court erred both in striking the jury demand and in granting judgment as a matter of law on vicarious liability, the proper remedy would be to reinstate the profits amount determined by the jury.  *See Thompson*, 963 F.2d at 890 (where the jury is not informed that its decision was advisory, "[t]he proper course under these circumstances is to direct that judgment be entered based upon the jury's verdict").  The district court never

-54-

informed the advisory jury that its verdict on disgorged profits was advisory.  *See* 2-ER-87-147.  Nor can Rearden itself claim any prejudice by reinstating the jury's verdict.  *See* Br. 39 (claiming Rearden's trial strategy assumed it was presenting its case to the jury).  Indeed, Rearden itself proposed that "submission of the issue to the jury on an advisory basis will provide a verdict that may be implemented in the event the Court's decision is reversed on appeal."  1-SER-37 n.13.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING THE APPORTIONMENT OPINIONS OF REARDEN'S DAMAGES EXPERT

"[T]he trial judge must have considerable leeway" in "determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Accordingly, this Court reviews the district court's decision to admit or exclude expert testimony "for abuse of discretion" and will reverse "only if that decision is 'manifestly erroneous.'"  *United States v. Decoud*, 456 F.3d 996, 1013 (9th Cir. 2006) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)).  Rearden fails to demonstrate that either of the district court's reasons for excluding Mr. Fier's apportionment opinions—his failures to "employ an identifiable methodology in estimating" his "'% related to MOVA'" figures and to explain how his experience led to his opinions, 1-ER-27:10-29:24—was manifestly erroneous.

Mr. Fier's primary apportionment analysis proceeded in three steps.  *First*, he calculated percentages reflecting the number of times each of 16 drivers of

audience interest in seeing the movie—such as Emma Watson playing Belle—were mentioned in exit-polling data. 4-ER-591-600. *Second*, Mr. Fier purported to assign specific percentages—down to the tenth of a percentage—reflecting the extent to which he believed MOVA contributed to each driver. 4-ER-608-613. *Third*, he multiplied those two percentages to derive his apportionments. *Id.* Mr. Fier documented each step in a separate column in his apportionment tables:

**Table 18**: Apportionment of profits using Kershaw's method

| Reason | Apportion | % related to MOVA | Apportion to MOVA |
|---|---|---|---|
| Emma as Belle | 17.00% | 2.5% | 0.43% |
| The Story | 17.00% | 10% | 1.70% |
| I'm a fan of the original film | 17.00% | 10% | 1.70% |
| Music and song | 11.00% | | 0.00% |
| It's from Disney | 11.00% | | 0.00% |
| Cast overall | 5.00% | 25% | 1.25% |
| VFX | 10.00% | 50% | 5.00% |
| The Romance | 0.50% | 25% | 0.13% |
| Reminds me of childhood | 0.50% | | 0.00% |
| Characters overall | 0.50% | 10% | 0.05% |

Br. 53; 4-ER-612. The second step of this analysis—the "% related to MOVA" column—was not based on exit-polling data or any other objective evidence or methodological approach. Rather, it was based entirely on Mr. Fier's subjective views after watching the movie once through, purportedly in light of his experience in film finance and distribution. 4-ER-609.

For example, Mr. Fier opined that 2.5% of audience interest in seeing Emma Watson was attributable to MOVA—despite the fact that MOVA was indisputably not used for the Belle character. 4-ER-608. His report offered no explanation for

the 2.5%—or 13 of the 16 other "% related to MOVA" percentages—and when asked to explain how he came up with these percentages at deposition, he testified: "I felt like those were reasonable numbers. That's all I can say. I can't explain why something is two, two and a half percent, or three." 1-ER-27:21-25; *see also* 1-SER-127:1-24.

Mr. Fier's alternative apportionment approach equally lacked any objective basis. It was based solely on the percentage of shots in the movie for which DD3 used MOVA data, which Mr. Fier calculated as 8.9%. 4-ER-610-614. Thus, Mr. Fier's second approach treated the value of any shot for which MOVA was used to help animate the Beast's facial movements as being 100% attributable to MOVA—regardless of what else contributed to that shot. 1-ER-28:9-22.

Rearden's arguments about Mr. Fier's reliance on exit-polling data, Br. 51-53, are not responsive to the methodological flaw the district court identified. Only the first step of Mr. Fier's analysis (the "Apportion" percentage) was based on the exit-polling data that WDP's marketing expert, Kristie Kershaw, also analyzed. Br. 51-53. The district court did not fault this step of Mr. Fier's analysis, nor did it criticize Mr. Fier for drawing different conclusions than Ms. Kershaw from similar data.[7] The issue was Mr. Fier's failure to "employ an identifiable methodology" in

---

[7] Rearden's reliance on *Dorn v. Burlington Northern Santa Fe Railroad Co.*, 397 F.3d 1183 (9th Cir. 2005) is misplaced. The district court did not exclude Mr. Fier's apportionment opinions because he was offering "*contradictory testimony*

-57-

the *second step*—the "% related to MOVA" percentages. 1-ER-27:1-28:22. Mr. Fier's report offered no explanation whatsoever for the "% related to MOVA" percentages for 14 of the 16 drivers, and when asked to explain the numbers at his deposition, he could not. That Mr. Fier examined objective data in the first step of his analysis does not cure the lack of any "basis grounded in objective fact" for the second step, or the resulting apportionments in the third step. 1-ER-27:1-29:12.

Rearden also fails to address the district court's concerns about Mr. Fier's experience. Rearden reiterates Mr. Fier's professional experience in film finance, distribution, and marketing, Br. 56 n.7, but does not explain how that experience equipped him to opine on the contribution of a particular visual-effects technology to the on-screen appearance of the Beast and to the movie as a whole. 1-ER-29:13-23. This omission was significant because Mr. Fier has no experience in computer graphics or film production, admitted at his deposition that he did not know how MOVA works or what the technology did or did not contribute to the CG Beast, and conceded he had taken no steps to find out (such as reviewing the report or testimony of Rearden's technical expert). 1-SER-118:13-15; 1-SER-119:18-124:24; 1-SER-125:8-126:7.

---

[to Ms. Kershaw's] . . . *using a different methodology*." *Id.* at 1196. The court excluded Mr. Fier's apportionment opinions because the "% related to MOVA" percentages lacked "any coherent methodology." 1-ER-28:23-24.

Mr. Fier's alternative apportionment approach—which Rearden briefly

mentions, Br. 54—suffered from the same flaw. Mr. Fier never explained how his

experience equipped him to opine on the contribution of MOVA to finished shots

in the film and his assumption that the contribution was 100% was "inconsistent

with the report on which Mr. Fier relied for that information as well as the

remaining body of evidence in the case." 1-ER-28:9-10.

## IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING THE DD3 INDEMNIFICATION AGREEMENT

This Court reviews the district court's exclusion of the DD3 indemnification

agreement under Rule 403 with "considerable deference," *McEuin v. Crown Equip.*

*Corp.*, 328 F.3d 1028, 1035 (9th Cir. 2003), *as amended on denial of reh'g and*

*reh'g en banc* (June 17, 2003), and will uphold the decision "absent clear abuse of

discretion," *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996).

The district court acted well within its discretion in excluding evidence of

the DD3 indemnification agreement. Courts consistently exclude indemnification

evidence under Rule 403 because "the evidence can be prejudicial and is generally

not highly probative." *Armstrong v. Hawaiian Airlines, Inc.*, No. 18-00326 ACK-

WRP, 2019 WL 13162437, at *11 (D. Haw. Oct. 29, 2019) (excluding

indemnification evidence under Rule 403); *Ioane v. Spjute*, No. 1:07-CV-0620

AWI EPG, 2016 WL 4524752, at *9 (E.D. Cal. Aug. 29, 2016) (same); *Estate of*

*Clayton Roy Zahn v. City of Kent*, No. C14-1065RSM, 2016 WL 541397, at *2

-59-

(W.D. Wash. Feb. 11, 2016) (same). These decisions acknowledge the substantial risk that indemnification evidence may unfairly influence the jury's liability and damages determinations, as the jury may "reason[] that the defendant would not have to pay whatever damages were awarded." *Ioane*, 2016 WL 4524752, at *9.

This Court has recognized the same risk. In *Larez v. Holcomb*, 16 F.3d 1513 (9th Cir. 1994), this Court held that indemnification evidence is not admissible on the issue of damages in a Section 1983 action. *Id.* at 1518-19. This Court reasoned that such evidence may "distr[a]ct the jury from dispassionate determination of an appropriate damages award," and divert the jury's attention "to a flurry of largely irrelevant assertions and counter assertions who may or may not be financially harmed by a particular award." *Id.* at 1519.

WDP raised exactly these concerns in moving for exclusion. In particular, WDP argued that the jury would be more inclined to find liability and to inflate its damages award if the jury believed that the alleged direct infringer DD3 would ultimately be responsible for the verdict. 1-SER-115. WDP further argued that, to refute this highly prejudicial inference, it would have to put on a mini-trial about DD3's indemnification positions, which would only confuse and distract the jury. *Id.* It was not an abuse of discretion—much less a clear abuse—for the district court to conclude that these risks outweighed any probative value.

-60-

Rearden argues the DD3 indemnification agreement was probative of the "*credibility* of DD3 evidence," but misdescribes this evidence and its role at trial. Br. 57. Rearden claims "DD3 witnesses appeared to the jury to be disinterested rather than witnesses who worked for a company responsible for the entire financial outcome of the case," Br. 57-58, but neglects to mention that *no DD3 employees testified live at trial*. Darren Hendler—the only DD3-affiliated witness Rearden identifies in this section of its brief—was not a DD3 employee when he testified at trial, as Rearden admits. Br. 57 ("former DD3 employee Hendler"). The jury heard brief prior testimony from two witnesses who were DD3 employees at the time (Gayle Munro, Gregory LaSalle), but neither was asked about the indemnification agreement in the prior proceedings, so Rearden could not have presented cross-examination on potential bias, even if the agreement had been admitted. 2-SER-372-382; 2-SER-391-399; 2-SER-284:5-303:18.[8]

Rearden also claims that WDP's "apportionment theory depended almost entirely on" the "*credibility* of DD3 evidence." Br. 57. This is nonsense. Three experts provided the foundation for WDP's apportionments: technical expert Dr. Stephen Lane; marketing expert Kristie Kershaw; and damages expert Robert Wunderlich. These experts exhaustively analyzed the contemporaneous

---

[8] Rearden itself also offered brief prior testimony from O.D. Welch, another former DD3 employee, who was not asked about the indemnification agreement. *See* 1-SER-76.

production, marketing, and financial records for *BATB*—none of which depended on the "credibility" of DD3 witnesses. *See* 2-SER-266:3-11; 2-SER-275:13-15; 2-SER-277:3-7; 2-SER-278:12-281:2; 2-SER-317:2-321:2; 2-SER-324:8-328:7.

The "DD3 evidence" Dr. Lane analyzed consisted of business records such as timecards, task-tracking data, and shot histories from DD3's payroll and project-management systems. 2-SER-317:2-319:3. Dr. Lane's own calculations based on DD3's time records do not depend on any witness's credibility, nor does Rearden offer any reason to believe DD3's contemporaneous business records are not credible—nor could it given that Rearden itself stipulated to the admissibility of those records. *See* 1-SER-110-111.

For the same reasons, Dr. Wunderlich's reliance on Dr. Lane's opinions does not raise any DD3 credibility issues. *Cf.* Br. 57-58.

In short, Rearden has not shown that the indemnification agreement had any probative value, much less that the district court clearly abused its discretion in its Rule 403 balancing.

## CONCLUSION

The Court should affirm.

DATED: February 3, 2025   MUNGER, TOLLES & OLSON LLP


By:    */s/ Kelly M. Klaus*
     KELLY M. KLAUS
     Attorneys for Defendant-Appellee Walt
     Disney Pictures

## STATEMENT OF RELATED CASES

Defendant-Appellee is not aware of any related cases pending before the

Court.

DATED:  February 3, 2025          MUNGER, TOLLES & OLSON LLP


By:   _____*/s/ Kelly M. Klaus*_____
                 KELLY M. KLAUS
                 Attorneys for Defendant-Appellee Walt
                 Disney Pictures

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  24-3970

I am the attorney or self-represented party.

**This brief contains**  13,883  **words,** including  50  words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Kelly M. Klaus  **Date**  2/3/2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**  *Rev. 12/01/22*